**CLAWSON & BALS, Inc., v. HARRISON, Collector of Internal Revenue.**

No. 6939.

Circuit Court of Appeals, Seventh Circuit.
Dec. 13, 1939.

Rehearing Denied Jan. 24, 1940.

Thomas M. Kavanagh, of Chicago, Ill., and E. R. Morrison, Delos C. Johns, and W. B. Cozad, all of Kansas City, Mo., for appellant.

George H. Zeutzius, Sp. Asst. to Atty. Gen., Dept. of Justice, Tax Division, Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Norman D. Keller, and George H. Zeutzius, Sp. Assts. to the Atty. Gen., for appellee.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

TREANOR, Circuit Judge.

This is an appeal from the judgment of the District Court dismissing plaintiff-appellant's action for the refund of $54,232.02, assessed and paid by plaintiff, as manufacturer's excise taxes and interest.

The sole question presented is whether sales of automobile connecting rods by plaintiff were taxable under the statute which imposes a tax upon automobile parts "sold by the manufacturer, producer, or importer" thereof.[1]

The taxpayer is a corporation authorized under the laws of Illinois "to manufacture, buy, sell, export and import, deal in and deal with all kinds of automobiles and automobile accessories, and all other articles incident to automobiles * * *." It prepares connecting rods from steel forgings, for sale in the trade, and concedes that it is a manufacturer or producer within the taxing statute, of these connecting rods. It also prepares rods from used connecting rods which have been discarded and replaced by new rods, but contends that in respect to these rods it is a repairer and not a manufacturer or producer.

The rods in question connect the piston head to the crank shaft, and serve to transmit the power generated in the cylinder to the crank shaft, being attached to the crank pin of the latter. There is a ring bearing made of a babbit metal, known as the crank shaft bearing, in the large end of the connecting rod, such bearing being included partly within the cap and partly within the shank of the rod. The cap and shank are held together by bolts and nuts. The smaller end of the rod is known as the wrist-pin end; and approximately half of the rods prepared by plaintiff during the taxable period had bronze bushings in the wrist-pin end. These bushings are ring bearings, and for the rods which have them they are "just as important and just as necessary as the babbit bearing" at the larger, or crank shaft, end of the rod.

\* \* \* \* \* \*

"(c) Parts or accessories (other than tires and inner tubes) for any of the articles enumerated in subsection (a) or (b), 2 per centum. * * * (Note: Subsections (a) and (b) refer to automobiles, automobile trucks and motor cycles.)" 26 U.S.C.A. following section 1481.

---

[1] Revenue Act of 1932, c. 209, 47 Stat. 169.

Sec. 606. Tax on Automobiles, etc.

"There is hereby imposed upon the following articles sold by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold:

The taxpayer obtains its supply of used rods chiefly from jobbers or from persons known in the trade as "junkies." When plaintiff receives the second hand rods they are unusable as connecting rods because the babbit bearings and bronze bushings are worn; and in many of the discarded rods old shims between the cap and shank must be replaced and the rods realigned. The first operation is to separate the cap and shank by the removal of two bolts and nuts. Usable bolts and nuts are not replaced in the caps and shanks from which they are removed but are thrown into the general mass of nuts and bolts, new and old. The shank and cap are separately placed in a melting pot where all of the old babbit metal bearing is removed.

This ends the dismantling process by which the original used rod is reduced, in form, to two pieces of steel which must be subjected to various operations, including machine work, in the process of being prepared for sale as connecting rods. According to taxpayer's witness the processes and operations consist of grinding operations, machining operations and assembling and combining of new with old materials, a combining of all materials, and the utilization of workmanship and skill.

When the taxpayer buys new forgings from which to prepare connecting rods a forging may consist of a single unit or of two units, one unit forming a cap and the other the shank. If the forging is in the form of a single unit, a portion of one end is sawed off to form the cap. Each new forging is designed for a connecting rod for the motor of a particular make and model of automobile and carries an identification mark and number. In the case of a new forging the necessary machine work required to convert it into a connecting rod includes boring out the big end and the small end, drilling the necessary bolt holes, performing of necessary milling work, cutting off the cap if the forging is in one piece, and drilling oil relief holes.

Taxpayer's witness testified that when the forging arrives at the babbitting stage it undergoes substantially the same process and operations as the used rods. These operations are performed by the same men and by the same machines.

The first step in assembling the parts of the connecting rod consists of fastening the cap and arm together; but before this is done some of the babbitting operations are performed. A flux is applied to the inner surfaces of the semi-circular openings of the cap and shank to prepare the steel metal for a coating of tin, which in turn acts as a bond for the babbit metal and the steel cap and shank. This is described by a witness as a bonding operation. A coating of flux is necessary to cause the tin to adhere to the steel and, in the words of the witness, "that acts as a bond and makes the babbit metal stick so it becomes a part of the steel."

Following the application of the flux the arm and cap are separately dipped into a pot containing the molten tin; then the cap and arm are put into a machine with the proper size of mold and the molten babbit metal is poured into the bearing openings. The cap and arm are then subjected to a lathing, or abrasing operation for the purpose of removing the babbit metal which protrudes from the respective portions of the bearing ring in the cap and arm. This latter operation leaves an even surface and the cap and arm are assembled and fastened together with the bolts and nuts, the bearing portions of the cap and arm which are thus brought together forming a perfect circle. An opening is then drilled through the babbit metal, the opening being approximately 10/1000 of an inch smaller than the finished diameter of the bore, which is attained by a broaching operation. Oil grooves and channels are cut on the inside of the babbit bearing for oiling purposes and oil holes are drilled through the babbit to connect with oil holes in the steel cap or shank. The assembled rod if composed of parts of an old rod, is then placed on a pressing machine where the old worn bushing is forced out and a new bushing forced in the bushing operation being required for about 50% of the connecting rods prepared from used rods. In case of connecting rods for Fords the bushing is grooved on the inside, the groove completely severing the bushing bearing into two parts. Twenty-one different operations are required in the preparation of a usable Ford rod from a used connecting rod. The assembled rod is next checked for alignment and twist, a jig machine being used for this operation; and any defect in alignment or twist is corrected.

In the course of announcing its decision the District Court made the following statement:

"The court is of the opinion that what the plaintiff did and what it is doing is the manufacturing and producing of connecting rods from scrap. It is true that the scrap may have slightly greater value than some other kinds of scrap, but it is still scrap, and when it is manufactured or produced by the plaintiff it has a relatively much greater value than in its scrap condition.

"The situation here seems to be much like the situation in the worn-out tire case. Those worn-out tires look like tires. These worn-out connecting rods undoubtedly look like connecting rods, and one can recognize that they have been connecting rods, just as one can by looking at a worn-out tire recognize the fact that it has been a tire. But in each case, the articles are worn out. A manufacturing process is, in the opinion of the court, required to make a serviceable product; and in the case of the connecting rod, the plaintiff carries on that manufacturing process."

We believe that the foregoing aptly sums up the merits of the case.

Plaintiff questions the application of the term "scrap" to used rods and states that there is nothing in the evidence from which it can be determined what the court meant by the term "scrap." But as revealed by the foregoing excerpt from its memorandum the District Court meant by "scrap" simply "worn out connecting rods," automobile parts which as a result of use were unfit to perform the function for which they had been designed, and which could not perform their original function until they had been re-made in respect to certain essential and most characteristic parts. The District Court concluded that the operations involved in this process constituted manufacturing or producing within the meaning of the pertinent statutory provision.

Defendant-appellee cites and relies strongly upon a decision of the Supreme Court of Canada in Biltrite Tire Co. v. The King.[2] The analysis of the facts and the reasoning of the court as revealed in the opinion are strongly persuasive that on the facts of the instant case the taxpayer is a manufacturer or producer of connecting rods. The legislative enactment imposed an excise duty on "tires in whole or in part of rubber" which were "manufactured or produced in Canada and sold." The business practice of the Canadian taxpayer was to purchase in bulk lots old and worn-out motor vehicle tires and put them through a process of repair, treatment and retreading, for sale in the trade. Throughout the process the sidewall of the tire was not dismantled or destroyed, the numerical identification of the original tire was not destroyed, and the name of the manufacturer of the original tire was clearly marked upon its sidewalls, upon which the taxpayer also marked a serial number. In the course of treatment of the old tire the tread was removed and a new tread affixed; holes were patched, cement and plastic rubber preparation utilized. The final result of the treatment was that repairs to holes and blow-outs, the cementing inside and without, and the new tread, were firmly and permanently affixed to the fabric and sidewalls of the original tire. The Canadian court sums up the whole process as follows:

"What the appellant did was to remove part of the old or worn-out tire and add to the remnant the plastic rubber preparation. It would appear that the position is the same as if the appellant had purchased an old or worn-out tire which had already been treated by the vendor in the manner described above, down to and including the cutting off of the old tread. If then the appellant had purchased from a third party the rubber preparation and had applied the latter and continued with the subsequent steps, could it be suggested that the article in its final condition had not been produced or manufactured by the appellant? The definitions of words 'manufacture' and 'produce' as nouns or verbs, in the standard dictionaries, clearly indicate that such proceedings would constitute the appellant a manufacturer or producer. And the mere fact that the appellant has itself performed the defined operations on the old tire cannot exclude it from the operation of the section.

"* * * It is suggested that the old or worn-out tire did not lose its identity qua tire and that, therefore, the appellant could not be said to have manufactured or produced a tire. However, when one bears in mind the various steps taken by appellant and particularly the state of the article when the tread was removed, it would appear that appellant cannot be any less the manufacturer of a tire because it started with something that had once been a usable tire than if, as suggested in the pre-

---

ceding paragraph, it had commenced with two substances purchased from different sources."

As disclosed by the evidence in the instant case the taxpayer purchases the discarded connecting rods and by a dismantling or disassembling operation reduces them to substantially the same physical condition as that of the new forgings when the holes have been bored in them, preparatory to rebabbitting and bushing operations and to the combining of the cap and arm. At that stage the used connecting rod has been reduced in form to some of the parts of the original connecting rod; and in order to transform it into a connecting rod there must be an assembling of these parts with other materials which are just as essential as the parts salvaged from the old connecting rod; and it is only by an assembling and combining of the old and new parts and the addition of new materials by a series of mechanical operations that a connecting rod is produced. Furthermore, the mechanical operations and the processes of combining old with new material required to make a saleable connecting rod out of the usable parts of an old connecting rod do not differ substantially from those required to produce a saleable connecting rod from a fresh forging, and the taxpayer concedes that this process is manufacturing or producing within the revenue act.

There is obvious difficulty in treating the taxpayer as a repairer in view of the normal concept of the relation of a repairer to the repaired article. Ordinarily a repairer furnishes labor and material to the owner of some article for the purpose of restoring the article to its normal condition. The article remains the property of the one for whom the service is performed. If this taxpayer is a repairer it is a repairer of its own property, not for the purpose of restoring its own property for efficient use in the ordinary operations of the taxpayer's business, but for the purpose of preparing the property for sale in the trade. In the transactions between the taxpayer and its vendees the connecting rods, whether prepared from new forgings or from old connecting rods, are treated as newly and freshly produced automobile accessories. Neither taxpayer nor the trade recognizes that the finished connecting rods are repaired rods. Looked at from the standpoint of production and distribution in the trade the taxpayer is per-

forming the function of a manufacturer rather than a repairer. The taxpayer is producing connecting rods for the trade in a very true sense and not repairing old connecting rods for owners or users. The fact that the taxpayer could perform for the owner of used connecting rods all of the mechanical operations which it does perform under the facts of this case, and still properly be classified as a repairer, does not require a holding that the taxpayer is a repairer when it purchases discarded rods to be used as materials for combination with other materials of the taxpayer, and by means of mechanical operations prepares what are, for all practical purposes, new connecting rods for sale in the trade.

We conclude that the District Court did not err in holding that the taxpayer was a manufacturer or producer of the connecting rods and subject to the tax imposed by Section 606 of the Revenue Act.

Judgment affirmed.