## UNITED STATES v. MOROLOY BEARING SERVICE OF OAKLAND, Limited.

### No. 9786.

Circuit Court of Appeals, Ninth Circuit.

Dec. 15, 1941.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, and George H. Zeutzius., Sp. Assts. to Atty. Gen., and Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellant.

Adolphus E. Graupner and Louis Janin, both of San Francisco, Cal., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This is a companion case to United States v. J. Leslie Morris Co., 124 F.2d 371, today decided.

Appellee taxpayer is engaged in the same character of enterprise as the J. Leslie Morris company, and its plant, located at

---

[4] 309 U.S. 685, 60 S.Ct. 808, 84 L.Ed. 1028.

[5] 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531.

374

Oakland, is affiliated with those of that company. It is incorporated under the laws of California. Monthly, from February, 1933, to August, 1936, in compliance with the demand of the Collector of Internal Revenue, it filed manufacturer's excise tax returns and made tax payments (totaling $1,099.80) under § 606(c) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev. Code, § 3403(c), in respect of sales of automobile connecting rods during that period.[1] It thereafter made claim for refund and on rejection of its claim brought suit, recovering a judgment from which the government appeals.

In the present case, as in United States v. J. Leslie Morris Co., supra, the taxpayer argues that it is a repairer, rather than a manufacturer or producer. Here, however, the taxpayer in support of the claim that its activities are not within the reach of the statute, makes a further contention, namely, that it did not make sales of the processed parts or accessories. We will notice the latter contention only, as the first has been disposed of adversely to appellee in the J. Leslie Morris opinion.

It is not clear what conclusion the trial court reached on the issue of sale. In its memorandum opinion the court states that the "right to recover herein depends upon whether the process of rebabbiting the connecting rods was one of manufacture or one of repair. If the former, the tax was properly imposed." However, the findings adopted are to the effect that the transactions amounted to "exchanging said repaired rods for other old and used rods plus, in cash, the charge for repairing", and that these exchanges did not constitute sales. The evidence is not substantially conflicting, and the findings in this respect involve mixed questions of law and fact.

Taxpayer states that its "method of disposal of connecting rods which it repairs is to exchange a repaired rod for a worn rod and charge only for the repair, as though it had been made on the turned-in worn rod and the customer waited for direct delivery. When a stock of rods is distributed to a jobber and no exchange rods are then received, appellee charges the forgings to the jobber to protect itself, but when the exchange rod is received the customer is credited with the amount charged. This is not a sales transaction but one of record protection."

The record does not appear entirely to bear out counsel's analysis of the process. During the period in question taxpayer did not deal with the general public—that is, with owners of automobiles—either in its acquisition of the used parts or in its disposal of the processed rods. The used forgings appear to have been acquired from two sources, (1) from brokers who make it their business to buy connecting rods from automobile wrecking establishments with the idea of selling them in turn to concerns like the taxpayer; and (2) from jobbing customers who turned in used rods on their purchases of processed rods of similar type. The latter transactions (with the jobbers) were on what is known in the trade as the exchange basis of sale for replacement. The jobbers, in their turn, sold the processed rods to garages or repairmen. There are jobbers in all important towns in the area extending from Fresno to the Oregon line, and it was to these jobbers that taxpayer disposed of its product.

A further word descriptive of the business methods pursued will be helpful. The connecting rods were known by and sold to the trade under taxpayer's own trade name, "Mor-o-loy". Taxpayer always carried about 4,000 connecting rods in stock, consisting of as many as 250 different types. Each year it turned out more than 50,000 connecting rods, to each of which it assigned a stock number of its own for purposes of identification, the stock number being shown on taxpayer's own box in which the rod was placed. Jobbers ordered by stock number, the latter conforming to the number in taxpayer's catalogue. The box containing the rod had printed thereon, along with much advertising and descriptive matter, the following: "Guarantee. We agree to replace this assembly if defective in material or workmanship".

Stripped of argumentative verbiage, the business phase of the enterprise appears to have been conducted substantially in this manner: Taxpayer acquired large quantities of worn connecting rods which had been salvaged by wreckers or traded in by jobbers, and after having processed them placed them on its shelves under its own stock number and trade name. These finished rods it disposed of, on order, for a price. The price might be paid wholly in money, or partly in money and partly in discarded connecting rods turned or traded

[1] The tax imposed by the statute is upon automobile parts or accessories "sold by the manufacturer, producer, or importer" thereof.

in by purchasers.[2] Taxpayer acquired title to the used rods and, on disposition after processing, parted with its title in return for a consideration in money or money's worth. We see in this practice no element of "charge for repairing", nor any reason for believing that the transactions did not result in taxable sales.

Neither the claim for refund nor the complaint in the suit was predicated on the ground that the amount exacted was more than was due or that the tax had been erroneously computed. No questions of that sort were raised. In the state of the record, we are obliged to assume that appellee paid the excise taxes on whatever sales basis it used in making its monthly returns. The question whether the proper basis for the computation of the tax is the total price, including cash and trade-ins, or some other basis, is not before us; and concerning that question we express no opinion.

Reversed.

[2] Obviously there were extensive sales of rods solely for a money consideration; otherwise the equivalent of the stocks of used forgings purchased from wrecking brokers would, after processing, simply have accumulated on the shelves.