## CLAWSON & BALS, Inc. v. UNITED STATES.
### No. 10076.

United States Court of Appeals
Seventh Circuit.
May 26, 1950.

Rehearing Denied June 29, 1950.

Harold T. Halfpenny, Richard F. Hahn, James F. Flanagan, Chicago, Illinois, Halfpenny & Hahn, Chicago, Illinois, for appellant.

Otto Kerner, Jr., U. S. Atty., John A. Looby, Jr., Asst. U. S. Atty., Chicago, Illinois, Theron Lamar Caudle, Asst. Atty. Gen., Melva M. Graney, Sp. Asst. to Atty. Gen., Ellis N. Slack, A. F. Prescott, Frederic G. Rita, Sp. Assts. to Atty. Gen., for appellee.

Before MAJOR, Chief Judge, and DUFFY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This action was brought to recover excise taxes assessed against the plaintiff under § 3404(c) of the Internal Revenue Code, 26 U.S.C.A. § 3403(c), for the period from April 1, 1941, to June 30, 1945. From a judgment for the defendant, the plaintiff brought this appeal.

This appeal presents two questions. (1) Whether sales of automotive connecting rods produced by the taxpayer by rebabbitting or regrinding used and worn connecting rods were taxable under § 3403(c) as sales by a manufacturer. (2) Whether the amount of credit for worn rods given purchasers of rebabbitted and reground connecting rods was properly treated by the Commissioner as part of the taxable purchase price.

Section 3403 provides as follows:

"§ 3403. Tax on automobiles, etc.

"There shall be imposed upon the following articles sold by the manufacturer, pro-

ducer, or importer, a tax equivalent to the following percentages of the price for which so sold: * * *

"(c) Parts or accessories (other than tires and inner tubes) for any of the articles enumerated in subsection (a) or (b), 5 per centum. * * *"

(Subsections (a) and (b) cover automobiles and trucks.)

The taxes here in question were assessed on sales by plaintiff of rebabbitted or reground connecting rods. The plaintiff insists that the work it performed on the used connecting rods, which were reconditioned for sale and sold, did not amount to "manufacture" of the rods within the meaning of the Act.

During the period in question, the plaintiff did not make any new connecting rods or any new forgings for the manufacture of connecting rods. Worn rods were procured which were no longer in condition to give acceptable service, and they were rebuilt or reconditioned so as to be suitable for further use. For the most part, these worn rods were procured from customers to whom plaintiff sold its reconditioned rods; some were acquired from persons other than customers. The plaintiff sold its reconditioned rods to: (1), jobbers who received used rods from garage mechanics, and (2) owners of fleets of trucks and busses. When the used rods were received by plaintiff, they bore the identification numbers placed thereon by the "original" manufacturer, and these numbers were neither obliterated nor changed by plaintiff in its reconditioning process.

The plaintiff used two methods of reconditioning these connecting rods. If the connecting rod was a "babbitt rod" it was first cleaned of grease, dirt and carbon. The cap was tightened to the shank by screwing the nuts tight. The babbitt metal inside the diameter of the large end was then bored out. The nuts were removed, the cap taken off the shank and the splits (flat surfaces where cap meets shank) were ground to remove burrs and make the splits flat. The bolt holes in the cap and shank were then cleaned by reaming and the edges of the holes were beveled. The

cap and shank were then bolted together again, with a thin shim placed in the split between cap and shank, for adjustment purposes by the automobile mechanic. The rod was then dipped in a melting pot to melt out the remaining babbitt and the inside diameter of the large end was fluxed, so as to make babbitt metal adhere thereto. The oil holes were corked closed, the rod was then held and whirled around, and molten babbitt was poured into the inside diameter of the large end, where it adhered to the fluxed surface. After cooling, the excess metal was polished from the faces of the large end. The rods were checked to ascertain that babbitt had not flowed into the bolt holes and thereby rendered the bolts immovable. If that had happened, the rod was re-run. If that had not happened, a cutter bored out excess babbitt from the inside diameter of the large end, the corks were removed from the oil holes, and the inside diameter of the large end was beveled at the faces.

A rectangular oil pocket was then cut into the babbitt at the oil hole in the cap, an oil cut was made in the babbitt at each split, and a circular oil groove was cut in the inside diameter's babbitt surface. The babbitt was then cut at the splits to permit a separation of the cap from the shank. The inside diameter of the babbitted large end was then cut out to correct size and the large and small ends were checked for parallel alignment. If aligned, the rod was cleaned, waxed and boxed ready to be shipped to a customer. In this rebabbitting process shims were added, and the babbitt, and in some instances, a nut or bolt, were replaced.

The non-babbitted connecting rod had a brass bushing within the small end which plaintiff removed. The rod was cleaned of grease, dirt and carbon. A cap and shank that matched each other with respect to inside diameter were selected and pressure was exerted laterally to squeeze the shank and cap, making the inside diameter of the large end elongated and thereby gaining metal to be ground out. The cap was removed from the shank and the split of the shank was ground down so as to restore the inside diameter of the large end to a

fairly round shape of smaller diameter than before the squeezing and grinding. In this process, in the squeezing, the bolt holes sometimes became smaller and the holes were then reamed out and their edges were beveled. The studs were rethreaded and buffed and the splits were buffed. The cap and shank were then assembled and the nuts were put on. The inside diameter of the large end was beveled at the faces and the high spots of the inside diameter were bored out. The cap and shank were then pressed together and the nuts were retightened. The faces were then ground, after which the inside diameter was ground. The rod was then ground across the width of the split and polished to remove grinding marks. A brass bushing was then inserted into the small end and oil holes were drilled through the bushing and its edges were beveled. The large and small ends of the rod were aligned and it was then waxed, boxed and ready for shipment to a customer. In the regrinding process the brass bushings and shims were added and, where necessary, a nut or bolt.

Although these reconditioned rods could not be sold as new, they were sold by plaintiff for $1.85 as compared to a price of $2.40 for a new rod. If the buyer turned in used rods suitable for reconditioning, he was given a credit of $1.10 each toward the purchase of reconditioned rods. As a consequence, plaintiff's product was sold at an out-right price, or at an "exchange price" where credit was so given.

The plaintiff earnestly contends that it was not a manufacturer or producer of these reconditioned rods, especially of the reground rods, within the meaning of § 3403(c). It also contends that if it is to be considered as a producer or manufacturer of these reconditioned rods the excise tax should be charged only on the amount of money it received on the exchange transactions, that is, that it should not be required to pay the excise tax on the $1.10 credit allowed for the used rod, but only on the 75¢ cash which it received.

The principal question presented by this appeal is not a question of first impression with this Court. The same plaintiff was before this Court in a prior case, Clawson & Bals, Inc. v. Harrison, 7 Cir., 108 F.2d 991, in which this Court held that the reconditioning of connecting rods by rebabbitting was "manufacturing" within the meaning of the applicable section of the Act. We find no substantial reason for distinguishing between plaintiff's processes of reconditioning by rebabbitting and by regrinding. In rebabbitting, shims and babbitt and, in some instances a nut or bolt, were added or replaced. In the regrinding process, shims were added; and a brass bushing and, in some instances, a nut or bolt were replaced.

The plaintiff insists that since its former case before this Court its reconditioning processes have been materially changed and that in the former case the used rods which it utilized were only junk rods having a value of only three or four cents a piece instead of the usable rods it now utilizes. It seems perfectly clear, however, that the used rods it is now using are not in such a condition as to give satisfactory service or the owners would not be offering them with money in exchange for plaintiff's reconditioned rods. In plaintiff's former case before this Court, it questioned the application of the term "scrap" to the used rods it was then using, and it now states that "scrap" are only such rods as cannot be reconditioned by its processes. We can only assume, therefore, that the used rods which it was then reconditioning were approximately the same as those it is now utilizing in its business.

Our opinion in the prior Clawson & Bals case was cited and followed in: United States v. Armature Exchange, Inc., 9 Cir., 116 F.2d 969, Certiorari denied, 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531 (rebuilding of armatures, using old cores); United States v. J. Leslie Morris Co., Inc., 9 Cir., 124 F.2d 371 (taxpayer was processing and selling "used or worn out automobile connecting rods"); United States v. Moroloy Bearing Service of Oakland, Limited, 9 Cir., 124 F.2d 373 (reprocessing connecting rods); and United States v. Armature Rewinding Co., 8 Cir., 124 F.2d 589 (reprocessing generators and armatures.)

In Monteith Bros., Co. v. United States, 7 Cir., 142 F.2d 139, we again passed on the question of the liability of a taxpayer, engaged in the business of rebuilding and repairing generators, armatures, and connecting rods for automobiles, to the manufacturers' excise tax. We there cited the prior Clawson & Bals case and other cases we have cited herein, noted that the Clawson & Bals case had been uniformly followed, and then stated, 142 F.2d at page 141: "For reasons stated in these opinions we are convinced that the taxes were properly assessed under section 3403, on the articles here involved."

In 1941 Congress refused to change the Act to exempt reconditioned automotive parts. The Senate Committee on Finance in its report (S.Rep.No.673, 77th Cong. 1st Sess. (Part 1) p. 48) said on this question: "There are several decisions of the United States circuit courts of appeals holding rebuilt parts and accessories to be subject to the manufacturers' tax. Rebuilt parts compete with new parts, and it appears appropriate that they should be subject to the same tax. Accordingly, no change has been made."

The plaintiff contends that its reconditioning of these rods did not amount to "rebuilding" but only to "repairing." The Merriam-Webster New International Dictionary defines "rebuild" as "To build again or to construct anew, usually the parts that are in good condition and some new parts being used." The reconditioning done by plaintiff would seem to fit this definition. Plaintiff's attempt to distinguish between "rebuilding" and "repairing" was not convincing. The dictionaries give "repair" as one of the synonyms of "rebuild." We think the common use of "rebuild" is the making of such extensive repairs on an object as to make it again useful for a period, almost as if it were new

However, regardless of the exact definition of "rebuild", the above quotation from the Senate Finance Committee had reference to the very type of reconditioning we are here considering. They there called such reconditioned parts "rebuilt"

parts and said they should be subject to the same tax as new parts.

This statement by the Senate Finance Committee is significant. It discloses that the attention of 'Congress had actually been called to some of the cases which we have cited above and that Congress had accepted these decisions as correctly interpreting the Congressional intent on this matter. This constitutes Congressional ratification of the interpretation of this Section by the courts and should be considered just as binding on the courts as if such reconditioned parts were expressly included in the Act.

The question as to whether the excise tax should be charged on the amount which plaintiff allowed as a credit for the used rods seems equally clear. In United States v. Moroloy Bearing Service of Oakland, Limited, supra, the taxpayer also insisted that in its "exchange sales" the transactions amounted to "exchanging said repaired rods for other old and used rods plus, in cash, the charge for repairing", and that these exchanges did not constitute sales. The Court held, however, that actually the taxpayer disposed of its reconditioned rods, on order, for a price, and said, 124 F.2d at page 374: "The price might be paid wholly in money, or partly in money and partly in discarded connecting rods turned or traded in by purchasers. Taxpayer acquired title to the used rods and, on disposition after processing, parted with its title in return for a consideration in money or money's worth. We see in this practice no element of 'charge for repairing', nor any reason for believing that the transactions did not result in taxable sales."

While the Court there said that it was not passing on the question of whether the tax should be computed on the total price including cash and trade-ins or on some other basis, we find in its description of the sale a description which fits the transactions of the plaintiff in the present case, and it seems that the very description of the transaction answers plaintiff's question. If the reconditioning of the rods amounts

to manufacture or production within the meaning of § 3403(c), then the sales price on which the tax is to be computed is necessarily the total sales price even though not all paid in cash.

The instances in which plaintiff reconditioned or rebuilt the customer's connecting rod and sent the same rod back to him are not here in question. We are here dealing only with instances where worn rods were delivered to plaintiff for a credit of $1.10 each on the purchase of reconditioned rods.

For the foregoing reasons the judgment of the District Court is affirmed.