### In re BURKHEAD.
Bankr. No. 695.

United States District Court
N. D. Texas, Lubbock Division.

Aug. 26, 1952.

Frank B. Potter, U. S. Atty. and A. W. Christian, Asst. U. S. Atty., Fort Worth, Tex., for the United States.

George W. McCleskey, Lubbock, Tex., for the Trustee in Bankrutpcy.

DOOLEY, District Judge.

A decision of the referee in bankruptcy, rejecting a claim for the federal manufacturer's sales tax on automotive parts, is challenged by the United States. The bankrupt was in business as a reconditioner and rebuilder of automobile, truck and tractor parts, including pressure plate assemblies, at his shop in Lamesa, Texas, from August 1945 to June 1949. He stocked about 15 pressure plate assemblies there at the outset and gradually acquired more but never owned in that stock for outright sale more than 50 or 60 of such units at a given time during said years. He also owned and had in stock some 150 to 200 more such units at a warehouse in Amarillo, Texas, during a part or all of the said time, but that stock seems unimportant to the present contest. Such articles were in tight supply during most of the period named, and consequently rehabilitating old ones was a good business. Nearly all of the bankrupt's customers at said shop were jobbers, and ordinarily several pressure plate assemblies were in each transaction. The bankrupt did business mainly on an exchange basis, where, not a sales price, but an exchange price, based on the labor service and cost, plus 10%, for any parts replacements, was quoted, that is in about 90% of the business transacted the customer would deliver to him disused but reclaimable pressure plate assemblies, and in the course of a few days the same number, makes and models of refitted units

would be delivered to the customer. In turn the customer also paid the bill for the proper amount specified in the exchange price list of the bankrupt. It does not appear that the bankrupt ever used units in his shelf stock at Lamesa for either immediate or later delivery against incoming units received for handling as an exchange transaction. The volume of business with such customers covered about 250 of these units a week. The jobbers sending in the unserviceable units did not intend to sell them to the bankrupt, nor did he intend to buy same, but the object was to provide an interchange center where the customer could turn in his disused units and get back refitted units to replenish his own stock. These units contained two relatively large pieces, plate and cover, and a number of small inexpensive parts. The incoming units at bankrupt's shop were taken apart and the various parts were put in a degreaser and next in a hopper to finish the cleaning job. Then the large parts and also the usable small parts such as springs, fingers, yokes, bushings, rollers, cotter keys, washers and screws were thrown in different bins holding articles of like kind, and any worthless parts large or small were thrown out and replaced either by used or new parts. All of the salvageable plates were resurfaced by machine. Workmen re-assembled, that is put together the necessary parts in working arrangement, to make a serviceable refitted unit. The method of business was such that the bankrupt had on hand in his shop a pool of such units being taken apart, cleaned, conditioned and put together at any given time, and the separate identity of the successive incoming units was not retained, so it would only be by the sheerest chance if the plate, cover and other parts contained in any given unit were ever collected together again in the same rebuilt unit. In the nature of the transactions the customer assumed equality between a refitted unit of the same make and model and the unit he delivered had same been processed separately and tendered back as the identical reconditioned unit. In other words, units of like make and model were looked on as akin to fungible property.

In the year of 1948 the bankrupt delivered to outright buyers and exchange customers 11,841 refitted pressure plate assembly units. This included only 158 outright sales of units owned, reconditioned and sold by the bankrupt for a straight cash price. The other units were all handled in exchange transactions as already described. The record does not disclose the total count of units handled during the almost four years in question, but if 1948 was an average year then presumably some 40,000 units all told were handled, including some 600 outright sales.

The adjudication of bankruptcy was in June 1949. The bankrupt had not filed any returns for the payment of the manufacturer's sales tax on his business levied by I.R. C. Sec. 3403(c), 26 U.S.C.A. § 3403(c), covering any of the period in question and he has not paid any such tax. The Government assessed against him a tax liability under said statute on the above recited transactions in the principal sum of $10,-341.26, and filed a claim for such alleged taxes, plus interest, together with some other small items of uncontested taxes, in this bankruptcy action. The trustee contested the bankrupt's liability for said sales taxes and the referee rejected entirely that part of the claim, on the theory that the bankrupt was not a manufacturer or producer selling automotive parts in the transactions aforesaid, but acted simply as a repair man. The Government was dissatisfied and presents its petition for review.

The pertinent statute (before 1951 amendment), together with administrative regulations and official interpretations, are noted below.[1] These regulations and sup-

---

1. I.R.C., Sec. 3403:

"There shall be imposed upon the following articles sold by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold:

\* \* \* \* \*

"(c) Parts or accessories" of automobiles, etc., 5%.

Reg. 46, Sec. 316.4:

"The term 'manufacturer' includes a person who produces a taxable article from scrap, salvage, or junk material, as well as from new or raw material, (1)

plementary interpretations, all together, rather clearly reflect the point of view that an owner doing certain rehabilitation work on automotive parts to then be stocked by him as rebuilt items for sale to the public generally, will properly be a manufacturer or producer as to such dealings in the sense of the law, while on the other hand one doing work of the same kind on like units owned by others, without any change of title, followed by delivery of such reworked units, or equivalent ones from a pool of similarly handled units, to the same owner, is properly a repairman or agent in contrast

by processing, manufacturing, or changing the form of an article, or (2) by combining or assembling two or more articles"

Reg. 46, Sec. 316.5:

"In general the tax attaches when the title to the articles sold passes from the manufacturer to a purchaser."

S.T. 927; CB 1942–2, p. 225:

"In general, any person who acquires ownership of unserviceable junk, scrap, or salvage materials or units and dismantles such materials or units into their component parts, discarding the unserviceable parts and assembling these serviceable parts, with or without the addition of new parts, into serviceable units or articles which he places in stock for future sale or exchange, is a manufacturer or producer within the meaning of chapter 29 of the Internal Revenue Code as amended and is liable for the tax on the sale of such units or articles.

"However, liability for tax under Chapter 29 of the Code, as amended, is not incurred where articles subject to the manufacturers' excise taxes are merely cleaned, painted, adjusted, or repaired by replacing minor parts which are worn or broken. Likewise, no liability for tax is incurred in connection with any work done for a customer which is in the nature of an immediate repair job. The tax does not apply in any case where an article is repaired or rebuilt under a contract for labor and materials, but if the article is rebuilt (not merely repaired) for a person regularly engaged in the business of selling such articles, such person incurs liability for the tax on his sale or exchange of the article."

S.T. 932; CB 1945, p. 431:

"The mere disassembling, cleaning, and reassembling (with any necessary replacement of worn parts with tax-paid parts) performed in reconditioning used automobile fuel pumps, water pumps, carburetors, distributors, shock absorbers, windshield wiper motors, brake shoes, clutch disks, voltage regulators, etc., do not incur manufacturers' excise tax under section 3403 of the Code regardless of by whom performed. However, any new taxable parts produced or erroneously purchased tax-free for use as replacements in reconditioning such units are subject to tax when used by the reconditioner.

"The manufacturers' excise tax applies to the rebuilder's sale from his stock on hand of (a) rebuilt batteries, (b) rebabbitted or machined connecting rods, (c) rebuilt clutch assemblies, (d) resurfaced clutch plates, (e) rewound armatures, (f) reassembled generators containing armatures rewound by the reassembler, (g) remetalized crankshafts, (h) motors in which the cylinders are machined, (i) shock absorbers in which some of the parts are machined, and (j) similar items in which machining, rewinding, or comparable operations are performed.

"In distinguishing between persons engaged in the business of rebuilding and mere repairmen, where a repair shop operator merely disassembles, cleans, and reassembles unserviceable units taken in exchange from a car owner (including in the job any machining or replacing of parts which is necessary) and the repair shop operator uses such rebuilt unit as a replacement of the next unserviceable unit which a car owner brings to his shop, no tax liability is incurred. On the other hand, a person who is engaged in the business of rebuilding automobile parts to be placed in stock for resale is liable for the tax.

"Where a rebuilder does not supply his customer with units already rebuilt and in his stock in exchange for any unserviceable units accepted by him for rebuilding, but merely rebuilds and returns to his customer a number of units equivalent to the number received from such customer which he finds are capable of being rebuilt, he incurs no tax liability on such rebuilt units, provided he did not acquire title to the unserviceable units and did not sell the rebuilt units, but instead charged only for his labor and any replacement materials supplied.

"In cases where a rebuilder sells units from stock and takes an old part in exchange, the amount allowed or, in the absence of a definite allowance, the fair value of such used article must be included in the sale price of the taxable rebuilt article in computing the tax."

530

to a manufacturer as to such transactions, within the sense of the law.

■ The bankrupt bought second hand pressure plate assemblies in small quantities at intervals from junk dealers to rehabilitate (like he did the exchange units) and then put in his shelf stock as supply maintenance for outright sales from time to time in the course of his business. The referee made no distinction in his ruling between the bankrupt's transactions by outright sales and his transactions on the exchange basis, and in that respect error was committed. The bankrupt is liable for the tax on his outright sale transactions in my opinion not only by the regulations and interpretations as above discussed but also under the rule of a well defined line of decisions.[2]

■ The bankrupt's exchange transactions, however, stand in a different position and apparently come squarely within the tax exemption test laid down in that part of S.T. 932 reading as follows:

"Where a rebuilder does not supply his customer with units already rebuilt and in his stock, in exchange for any unserviceable units accepted by him for rebuilding, but merely rebuilds and returns to his customer a number of units equivalent to the number received from such customer which

he finds are capable of being rebuilt, he incurs no tax liability on such rebuilt units provided he did not acquire title to the unserviceable units and did not sell the rebuilt units, but instead charged only for his labor and any replacement materials supplied."

The ruling just quoted is declaratory of sound legal principles. Government counsel say that the crucial question is whether the bankrupt was the buyer or the bailee of the units. The familiar statement that in a bailment the bailee is under duty to return the identical thing, in its original or altered form, or the product or proceeds thereof, is not exactly accurate in the present state of the law. A prominent exception is found in the storage of grain where by custom the warehouseman is authorized to commingle like grain of various depositors, but, aside from contrary contract, is due to maintain a sufficient stock of grain to provide for redelivery of the like quantity and quality of grain whenever demanded by the depositors.[3] The depositor remains the owner of his stored grain, and yet it is understood that not the same grain but instead equivalent grain will be redelivered. It follows that intended substitution of property is not necessarily inconsistent with a bailment,[4] and that proposition is not confined to bailments of grain.[5]

2. Replacement Unit Co. v. United States, 42–1 USTC 9401, pressure plate assemblies; Clawson & Bals, Inc., v. United States, 7 Cir., 182 F.2d 402, connecting rods; Clawson & Bals, Inc., v. Harrison, 7 Cir., 108 F.2d 991, connecting rods; United States v. Armature Rewinding Co., 8 Cir., 124 F.2d 589, generators and armatures; United States v. Armature Exchange, Inc., 9 Cir., 116 F.2d 969, armatures; United States v. J. Leslie Morris Co., 9 Cir., 124 F.2d 371, connecting rods; United States v. Moroloy Bearing Service of Oakland, Ltd., 9 Cir., 124 F.2d 373, connecting rods; Henricksen v. Seward, 9 Cir., 135 F.2d 986, 150 A.L.R. 1, connecting rods; Monteith Bros. Co. v. United States, 7 Cir., 142 F.2d 139, generators, armatures and connecting rods; Niagara Motors Corp. v. McGowan, D.C., 45 F.Supp. 346, connecting rods.

3. 6 Am.Jur. 208, sec. 47; Williston on Sales (Rev.Ed.) Vol. 1, p. 410, sec. 154.

4. Holbert v. Keller, 161 Iowa 723, 142 N.W. 962.

5. First Nat. Bank of Elgin v. Kilbourne, 127 Ill. 573, 20 N.E. 681, 11 Am.St.Rep. 174.
    Williston on Sales (Rev.Ed.) Vol. 2, p. 302, sec. 338:
    "Sir William Jones, in his work on Bailments, says: 'It may also be proper to mention the distinction between an obligation to restore the specific things, and a power or necessity of returning others equal in value. In the first case it is a regular bailment; in the second it becomes a debt.' This statement, in the same or slightly altered form, has been often quoted as expressing the correct doctrine. A little consideration will show that the statement cannot be literally accepted. If A. transfers the possession of A.'s horse to B. as A.'s

The clear business expediency behind the exchange dealings between the bankrupt and his customers does not carry any suggestion of sales transactions. The customers as jobbers had to think of a going business and their practice was to take in a disused unit from the buyer when selling a rebuilt unit from stock, and then the unserviceable units thus collected would be sent to the bankrupt for exchange handling so that the jobbers could receive back later an equal number of reconditioned units to keep pace with the turnover in their stock. Any notion of a sale being latent in such course of business would be pointless under the circumstances. It is more realistic, and likewise tenable, to stand on the premise that in law, as in practical business acceptation, the units sent in were constructively the same units received back with accretions and betterments incident to the reconditioning service, and that title throughout was retained by the customers. The bankrupt specifically never had title as owner of said units. Indeed if any shift of ownership is traceable in such dealings it would be more rational to say that there was an interchange between the customers interested in a given pool of units being worked on at approximately the same time. That analysis would not alter the role of the bankrupt. He still would have been bailee. The only differ-

ence is that his services as bailee would have been coupled with authority as mutual agent of the customers to interchange among them their property interests attached to the incoming units and make proper distribution of the rebuilt units to such customers. That would not be a novel or unorthodox relationship. It could be rested on eminent authority.[6] My conclusion is that the bankrupt in any event was bailee rather than owner of the units dealt with in his exchange transactions, and consequently he was not a manufacturer or producer selling such units so as to become liable for the tax claimed. This ruling does not conflict with any of the cases cited in footnote 2 of the opinion. In all of those cases the shop owner bought discarded articles and parts, and after reconditioning same put the items in his shelf stock for sale to the public generally, sometimes marketing the merchandise under his own trade name or brand, thus being held liable for the tax as a manufacturer selling automotive parts. Obviously the factual setting here is quite different. In fact some of those cases specifically left open the question here presented.

The action of the referee is reversed in part and is confirmed in part as herein explained, and counsel are directed to present a proper order in conformity with this decision.

---

agent, instructing B. to take the horse to town and receive in exchange therefor a horse from C., which is to be brought back to A., it is clear that B. is simply an agent or bailee. It may be urged that while B. has A.'s horse in his possession, A. may at any time revoke B.'s authority and reclaim the horse originally delivered to B. and that, therefore, B. is within the definition of Sir William Jones, since he is under an obligation to restore the specific thing given him. This is true, but the fact that the bargain does not contemplate the return of the specified thing delivered to the agent is likely to lead and has led courts to conceive, in view of Sir William Jones' definition, that the transaction is not a bailment."

The succeeding paragraph of said author will be quoted in the next footnote.

6. First Nat. Bank v. Kilbourne, supra.
Williston on Sales, supra, resuming

with the next paragraph after the quotation cited in the preceding footnote of this opinion:

"Moreover, it may be a part of the bargain between A. and B. that B. shall derive a profit from making the proposed exchange and B. may have made some advance upon the property, and in that case B.'s agency, if revocable at all, cannot be revoked without repaying him any advance that he may have made and profits that he would have earned. Yet it is clear that B. would still be a bailee of A.'s goods, not a purchaser of them. Where goods are consigned for sale, it is always the hope, and generally the expectation, that the goods consigned will be sold by the consignee and that money instead of goods will be returned to the owner. Nevertheless it is clear that the consignee is properly to be described as a bailee if his holding is for the consignor and the sale is made by him as agent for the consignor."