**SCHULTE OIL CO., INC. and RDL Service, Inc., Appellants,**

v.

**OKLAHOMA TAX COMMISSION, Appellee.**

**No. 80215.**

Supreme Court of Oklahoma.

Sept. 20, 1994.

Randy Mecklenburg, Harrison & Mecklenburg, Kingfisher, for appellants.

David Hudson, Gen. Counsel, Marjorie L. Welch, Deputy Gen. Counsel, Oklahoma Tax Com'n, Oklahoma City, for appellee.

OPALA, Justice.

Two issues are pressed: [1] Does remanufacture of unusable oilfield pipe constitute "manufacturing" within the meaning of 68 O.S.Supp.1990 § 1352(H) and 68 O.S.Supp. 1988 § 1359(A) and (C)? [1] and if so, [2] Is the diesel fuel used for protestant's forklifts consumed in the "manufacturing process" and hence exempt from sales tax? [2] We answer both questions in the affirmative.

## I

### THE ANATOMY OF LITIGATION

RDL Services, Inc. [RDL or taxpayer], appellant, is engaged in the business of (a) converting raw pipe (tubing and casing) into finished oilfield pipe, and (b) refurbishing used and damaged pipe into a marketable product. Its operation primarily consists of processing *new* (20%) and *used* (70%) pipe *for resale*. A small portion of the business is committed to repairing used pipe *belonging to others* (10%). RDL began business in January 1990 by purchasing the assets of an existing establishment which manufactured oilfield pipe. During the years it produced pipe, RDL's predecessor held a manufacturer's limited (tax) exemption [MLE] certificate, which entitled it to certain exemptions from the sales and use tax. An Oklahoma Tax Commission [Commission] auditor determined that RDL, like its predecessor, qualified for the exemption; and a MLE certificate was issued in its name on January 4, 1990. RDL's manufacturing process is identical to that of the predecessor business.

The controversy before us draws in question RDL's purchases of diesel fuel from Schulte Oil Co. [Schulte] to run forklifts at its plant during the period between January 31, 1990 and October 31, 1990. Unaware that RDL had a MLE certificate, Schulte inadvertently collected sales tax on these purchases and remitted the tax to the Commission. Schulte later sought a refund of $473.76. A field auditor from the Commission's Business Tax Division [Division] went to RDL's business premises to review its operations. Stating that the diesel fuel in question was a taxable purchase, the Division denied Schulte's refund claim by its letter of July 19, 1991. Six days later, the Division (a) notified RDL that, because its operations did not qualify for a manufacturer's exemption, the MLE certificate "had been issued in error" and (b) directed RDL to return the license for cancellation. RDL filed two protests to the Division's actions—one for itself and the other on Schulte's behalf. Because the majority of RDL's business (70%) consisted of *producing* pipe from *used* and *damaged* materials, an administrative law judge found that it was *not* engaged in manufacturing. She recommended that the sales tax refund claim be denied. The Commission also (a) denied the claim and (b) cancelled RDL's MLE certificate. The Court of Appeals affirmed the Commission's order.

## II

### THE DOCTRINE OF *ORAL ROBERTS UNIVERSITY v. OKLAHOMA TAX COMMISSION* [3] IS *SANS* RECORD SUPPORT FOR APPLICATION EITHER TO THE TAXPAYER'S OR TO THE COMMISSION'S POSITION

 *Oral Roberts* teaches [4] that an agency's *longstanding construction* of an am-

---

1. For the pertinent terms of 68 O.S.Supp.1990 § 1352(H), see Part III *infra,* and for 68 O.S.Supp.1988 § 1359(A) and (C), see *infra* note 14.

2. This opinion deals *solely* with remanufacturer's liability for sales or use tax. We express no opinion with respect to *any other tax exemption.*

3. Okl., 714 P.2d 1013, 1015 (1985).

4. *Oral Roberts, supra* note 3 at 1015. There, the Commission determined its earlier construction

biguous or uncertain statute will not be disturbed without cogent reason. Courts tend to accord great weight to an agency's construction of a statute when (1) the administrative interpretation was made contemporaneously with the enactment of the statute,[5] (2) a longstanding construction has been placed on the statute by an agency charged with its execution[6] or (3) a word-for-word reenactment of statutory text previously burdened with time-honored agency gloss may be regarded as the Legislature's act of acquiescence in the pre-reenactment administrative construction.[7] The *Oral Roberts* shield

of a tax law exempting sales to religious organizations was in error and the appellant, a denominational education institution, was required to remit sales tax. The court held that although an administrative agency generally has the flexibility to correct its own erroneous interpretation of the law, the previous agency construction is entitled to the "highest respect from the courts", especially when that construction is definitely settled and *uniformly applied for a number of years. Id.* at 1015. The court concluded that the earlier agency-imparted meaning will not be disturbed unless (a) the tax law in question is subject to more than one construction or interpretation and (b) there exist very cogent reasons for a change in the construction. For Oklahoma jurisprudence discussing the *Oral Roberts* doctrine, see *Shop and Swap Advertiser, Inc. v. Oklahoma Tax Com'n*, Okl., 774 P.2d 1058, 1059 (1989) (the court refused to apply the doctrine because it lacked sufficient support in the record); *Branch Trucking Co. v. Oklahoma Tax Com'n*, Okl., 801 P.2d 686, 689 (1990); *United Airlines, Inc. v. State Board of Equalization*, Okl., 789 P.2d 1305, 1311 (1990).

5. The U.S. Supreme Court declared in 1827 that "[i]n the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect." *Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210, 6 L.Ed. 603 (1827). *See* KENNETH CULP DAVIS, ADMINISTRATIVE LAW, § 5.04 at 133 (3d ed. 1972). More recently in *Davis v. United States*, 495 U.S. 472, 484, 110 S.Ct. 2014, 2022, 109 L.Ed.2d 457 (1990), where the weight of an IRS revenue ruling was considered, the Court stated that although "the [Internal Revenue] Service's interpretive rulings *do not have the force and effect of regulations, ... we give an agency's interpretations and practices considerable weight* where they involve the contemporaneous construction of a statute and where they have been in long use." (Emphasis added.) *Davis* suggests that an IRS revenue ruling is accorded "considerable weight" if it (1) was issued contemporaneously with the statute that is construed, (2) has existed for a long period of time, and (3) the statute's reenactment retains the language that was earlier construed by the agency. LINDA GALLER, "Emerging Standards For Judicial Review Of IRS Revenue Rulings", 72 BOSTON U.L.REV. 841, 876–77 (1992), notes that the most likely reason

for deferring to contemporaneous constructions "rests on the proximity of the agency to the legislature and to the legislative process that culminated in enactment of the statute." *Id.* at 876–877. *See, e.g., National Muffler Dealers Ass'n v. U.S.*, 440 U.S. 472, 477, 99 S.Ct 1304, 1307, 59 L.Ed.2d 519 (1979), which holds that a "regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent." *But cf.* GALLER at 876, where the author suggests that these are "intrinsically weak statutory aids and reliance on these factors is particularly inappropriate and unwarranted with respect to revenue rulings."

6. Two arguments traditionally have been offered for upholding longstanding agency interpretation. Deference to longstanding interpretation (1) provides certainty and predictability to persons affected by the interpretations and (2) encourages the lawmakers to make better laws. *See* CASS R. SUNSTEIN, "Interpreting Statutes in the Regulatory State," 103 HARV.L.REV. 405, 457–59 (1989). GALLER, *supra* note 5 at 881, observes that the Court's acknowledgement in *Davis, supra* note 5, 495 U.S. at 485, 110 S.Ct. at 2022, that "longstanding" construction is a significant factor in characterizing the weight of an administrative position contradicts the Court's earlier declarations in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 863–64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984). In the latter case, the Environmental Protection Agency [EPA] had changed its construction of the governing statute, and the plaintiff argued that because of the change the EPA's interpretation was no longer worthy of deference. *The Court expressly endorsed the agency's license to change its position, and rejected the notion that longstanding agency positions are entitled to more deference than recently adopted ones.* The discord between the two cases, GALLER observes, is difficult to reconcile. In *Chevron* the Court accorded *no* significance to the longstanding agency rule, but later in *Davis* it placed extra weight upon an interpretive rule *precisely because of its longevity.*

7. The so-called "reenactment rule" had its genesis in federal jurisprudence. *See, e.g., United States v. Cerecedo Hermanos*, 209 U.S. 337, 339, 28 S.Ct. 532, 533, 52 L.Ed. 821 (1908), where the Court held that "the reenactment by Congress, without change, of a statute, which had previous-

for preservation of long-continued agency construction *was invoked below only by the taxpayer.* Because there is no support in this record for any *prior, firmly established* Commission policy that would favor either party's contention, our decision must be rested on other grounds. *See* Part III of this opinion.

## A.

█ RDL argues that the *Oral Roberts* doctrine supports its position because for the 11 years before the cancellation in contest here the business held a valid MLE certificate. The taxpayer urges that the Commission may not modify its longstanding interpretation of the sales tax exemption statute. The Commission counters that it was the *character of RDL's business* at the point of its license cancellation, not the agency policy, that had undergone a change and thus occasioned the MLE revocation.

If by the Commission's longstanding policy *re*manufacturing had indeed been included within the orbit of manufacturer's exemption and there was record proof of agency conduct consistent with this interpretation, the taxpayer could rely on tacit legislative approbation of the agency's construction (either by long-continued silence or by post-interpretive reenactment of the exemption statute). To benefit from the *Oral Roberts* doctrine, RDL would have had to show (at the hearing

below) that its past holding of the MLE license (and that of the predecessor entity) for 11 years constitutes clear proof of the agency's *long-time commitment* to the view that the tax exemption in suit applies to *re*manufacturing process. The record fails to show this critical nexus.

## B.

Neither does *Oral Roberts* give comfort to the Commission's quest for placing RDL *dehors* the law's exemption. This is a question of tax liability. It presents a public-law controversy. In public-law litigation the reviewing court is generally free to grant corrective relief *upon any applicable* legal theory that finds support in the record,[8] but appellate freedom to raise and settle public-law issues *sua sponte* is circumscribed by the record brought before us for review. Issues clearly *outside* the record *may not* be addressed.

The restrictive meaning the Commission would have us today ascribe to the § 1359 exemption is *sans any* anchor in prior history or in the materials before us. The record (a) neither reveals a long course of agency's interpretive conduct that should be left judicially undisturbed (b) nor provides us with *any* proof of some longstanding administrative interpretation that would support the contended-for exclusion of *re*manufacturing process from the exemption in contention. The Division's [9] brief to the Commission ar-

---

ly received long-continued executive construction, is an adoption by Congress of such construction." In *Commissioner v. Flowers,* 326 U.S. 465, 469, 66 S.Ct. 250, 252, 90 L.Ed. 203 (1946), the Court said that a pre-reenactment interpretation "is deemed to possess implied legislative approval and to have the effect of law." Under the doctrine of legislative reenactment, administrative pronouncements are deemed to receive the lawmakers' approval whenever the legislature reenacts, without amendment, the text of an agency-interpreted statute. The fiction rests on a presumption that the legislature knew and tacitly approved of the administrative position when it reenacted the statute. Davis, *supra* note 5 at 132; Stanley S. Surrey, "The Code and Effect of Treasury Regulations Under the Income, Estate, and Gift Taxes," 88 U.Pa.L.Rev 556, 563 (1940). For Oklahoma jurisprudence applying the same principle, see *United Airlines, supra* note 4 at 1311.

8. *Reynolds v. Special Indemn. Fund,* Okl., 725 P.2d 1265, 1270 (1986), teaches that if in a public-law controversy the aggrieved party advances the wrong theory or reason for reversal, the reviewing court is free to grant corrective relief on *any* applicable theory chosen *sua sponte*—i.e., a theory that (a) is legally invocable to correct a *pressed* decisional error *manifested* by the record on appeal, (b) was neither advanced below nor on appeal and (c) is dispositive of the public-law controversy. *See First Federal Sav. and Loan v. Nath,* Okl., 839 P.2d 1336, 1343 n. 35 (1992); *Simpson v. Dixon,* Okl., 853 P.2d 176, 187 (1993); *In the Matter of McNeely,* Okl., 734 P.2d 1294, 1296 (1987); *Burdick v. Independent School Dist.,* Okl., 702 P.2d 48, 54 (1985); *McCracken v. City of Lawton,* Okl., 648 P.2d 18, 21 n. 11 (1982).

9. By "Division" we mean the Business Tax Division of the Oklahoma Tax Commission, whose denial of Schulte's refund claim precipitated this taxpayer's protest.

gues simply that "the processes of repairing used oilfield pipe do not come within the criteria generally recognized as manufacturing under our statutes and rules".[10] In support of its position that RDL's business is not "generally recognized as a manufacturer," the Division pointed out that RDL repairs pipe belonging to other companies. A true manufacturer, the Division added, "does not process materials that belong to someone else." [11] This observation seems of *no* consequence in considering the question before us since RDL's repair service, as noted in Part III *infra*, constitutes only 10% of its total operations. Moreover, the record reveals that the field auditor was himself at a loss to know from existing rules and regulations what tax treatment should be accorded RDL's *re* manufacturing process. His July 3, 1991 report (a) states that in his "opinion, the process in question does not fall under the definition of manufacturing" because the "casing and tubing does not have new forms, qualities, properties or combinations whenever the process is completed"; (b) observes that "[t]he only way, in my opinion, that the process could be considered manufacturing is that they are converting *unusable casing and tubing to usable casing and tubing*," [12] and (c) lists various equipment and materials that would be exempt "[i]f the process is deemed to be manufacturing." The field auditor testified that by the quoted expressions he meant that "*if someone could make a decision that simply converting … nonusable* [pipe] *to usable* [pipe] *was manufacturing, … * [he] *could see where they would have a point.*" (Emphasis added.) The Division's July 25, 1991 letter to RDL, by which refund was denied and the MLE certificate revoked, does not rest on longstanding policy. It explains *merely* that "[r]ethreading and testing used oilfield pipe does not qualify for the manufacturer exemption addressed in … [§] 1359".[13]

10. Record at 35 (trial brief at 4).

11. Record at 37 (trial brief at 6).

12. Record at 168 (emphasis added).

13. Record at 146.

In short, on this record we must hold that, because in this cause there is *no* support for any longstanding agency policy vis-a-vis the claimed tax exemption in suit, *neither party* can rely on *Oral Roberts* to advance for our approval some firmly-established agency position, developed over time, which clearly defined the contested exemption's outer perimeter.

### III

### *RE*MANUFACTURING OF USED OIL-FIELD PIPE CONSTITUTES *MANUFACTURING* WITHIN THE MEANING OF A MANUFACTURER'S EXEMPTION

The Commission asserts that, when engaged in restoring used oilfield pipe to its original condition, RDL is not a *manufacturer* but at most a *repairer.* Manufacturing occurs, the Commission argues, when *raw* or *new* material is processed for conversion into *a new form* or into one possessing new qualities or combinations. According to the Commission, the process of cleaning and repairing used pipe does not come within the criteria recognized as manufacturing by Oklahoma statutes and rules. RDL's business, the Commission urges, is analogous to that of a lawn mower repair shop, where the product is the same at the beginning and completion of the repair process—i.e., a used lawn mower. Because RDL is *primarily* engaged in the business of repairing *used oilfield pipe,* the Commission asserts, it does not qualify for manufacturer's exemption. In sum, the Commission takes the position that transformation of pipe from a damaged, *unusable* product into a *usable* commodity is *simply not manufacturing.*

RDL counters that it is and has always been primarily engaged in *manufacturing* within the meaning of 68 O.S.Supp.1988 § 1359(A) and (C) of the Sales Tax Code.[14]

14. The pertinent terms of 68 O.S.Supp.1988 § 1359, *the law in effect at the time of the taxable event in question here,* are:

"Exemptions—Manufacturers.
There are hereby specifically exempted from the tax levied by this article [Article 13—Sales Tax Code]:

When it restores used pipe to a marketable form, RDL urges, the pipe acquires *new qualities*—those which it did not have at the beginning of the remanufacturing process.

Section 1359(A) and (C) establishes (a) a *sales tax exemption* for manufacturers on *purchased property* that is *used or consumed in the manufacturing process* or property that becomes an integral part of the manufactured good as well as (b) an exemption for machinery purchased by the manufacturer which is directly used in the manufacturing process.[15] Section 1404(d) provides a manufacturer's *use tax exemption* for *purchases of property* that is *incorporated into and directly used in the process of manufacturing property*.[16] Manufacturing is defined by 68 O.S.Supp.1990 § 1352(H) as including

"every operation *commencing* with the first production stage of any article of tangible personal property and *ending*

(A) Goods, wares, merchandise, and *property purchased for the purpose of being used or consumed in the process of manufacturing, compounding, processing, assembling,* or *preparing for sale a finished article and such* goods, wares, merchandise, or *property* become integral parts of the manufactured, compounded, processed, assembled, or prepared products or *are consumed in the process of manufacturing,* compounding, processing, assembling, or preparing products for resale. The term manufacturing plants shall mean those establishments *primarily engaged in manufacturing* or processing operations, and generally recognized as such;

\*      \*      \*      \*      \*      \*

(C) *Sale of ... machinery and equipment purchased and used by persons in the operation of manufacturing plants already established in Oklahoma. This exemption shall not apply unless such machinery and equipment is incorporated into, and is directly used in, the process of manufacturing property subject to taxation under this article.* The term manufacturing plants shall mean those establishments primarily engaged in manufacturing or processing operations, and generally recognized as such; ...." (Emphasis added.)

15. For the pertinent terms of 68 O.S.Supp.1988 § 1359, see *supra* note 14.

16. The pertinent terms of 68 O.S.1981 § 1404(d) of the Use Tax Code are:

with the *completion* of tangible personal property having the physical properties which it has when transferred by the manufacturer to another." (Emphasis added.)

Both RDL and the Commission rely on *Cain's Coffee Co. v. City of Muskogee*[17] for the definition of "manufacturing". *Cain's* teaches that the word "manufacture" is *not* to be given its technical meaning and adopts the Century Dictionary definition of "manufacture" as "the production of articles for use from raw or prepared materials by giving these materials *new* forms, *qualities,* properties or combinations...."[18] This definition, the Commission asserts, has been adopted in Commission Rule 13.013.23.[19]

In support of its contention for a manufacturer status and hence for its entitlement to the § 1359(A) sales tax exemption, RDL also relies on *Cain's* progeny, *Tulsa Machinery*

"The provisions of this article [Article 14—Use Tax Code] *shall not apply:*

\*      \*      \*      \*      \*      \*

(d) in respect to the use of ... machinery and equipment purchased and used by persons to the operation of manufacturing plants already established in Oklahoma. Provided, *this exemption shall not apply unless such machinery and equipment is incorporated into, and is directly used in, the process of manufacturing property subject to taxation under Oklahoma Sales Tax Code,* Title 68, Article 13. The term "manufacturing plants" shall mean those establishments primarily engaged in manufacturing or processing operations, and generally recognized as such; \* \* \*" (Emphasis added.)

17. 171 Okl. 635, 44 P.2d 50, 52 (1935).

18. *Cain's, supra* note 17, 44 P.2d at 52.

19. Rule 13.013.23 (recodified as 710:65–150(d)(3)) states:

"Machinery and equipment used in the direct manufacturing process includes the machinery, tools, and equipment used directly by the purchaser in the production cycle provided such machinery, tools, and equipment act upon and have an effect on the article being produced. The fact that particular property may be considered essential to the conduct of the business of manufacturing because its use is required either by law or by practical necessity does not of itself mean that the property 'has a direct and immediate effect upon the article being produced.'"

*Co. v. Tax Commission* [20] and *McKee Products v. State ex rel. Tax Com'n.* [21] In these cases, RDL notes, the court held the taxpayer *was a manufacturer* even though the product at the end of the manufacturing process, as it is the case here, did not undergo a change of its essential properties. For example, in *Cain's, where* the taxpayer acquired raw materials—green and unprepared teas, spices, coffee, and other imports—to be treated and milled, the end product was still tea, spices and coffee. Similarly, in *Tulsa Machinery* and *McKee Products* the taxpayers "still came up with *rocks*" *after* crushing large pieces into smaller ones.

The salient point in each of these cases is that a product *was* changed into one that became marketable or more usable. Here, the process of rebuilding damaged oilfield pipe transforms a virtually unusable and non-marketable product into serviceable and saleable merchandise. While it is true that *after* the remanufacturing process is accomplished the end product is still *used oilfield pipe,* the remanufactured article is nonetheless *new and different from the form of the material used in making it.*

We agree with the Commission that there is a clear distinction between a *manufacturer* and a *repairer.* [22] Ordinarily a repairer furnishes labor and material to the *owner of an article* for the purpose of restoring its normal condition. In this situation the article *remains the property* of those for whom the service is performed. [23] A manufacturer, on the other hand, *purchases* the article it ultimately transforms into a *usable* product and then puts it on the market.

Limiting manufacturing, as the Commission urges us to do, *solely* to a process by which raw material is transformed into some new and different form would create a restriction not mandated by statute or decisional law. The Commission's position fails to consider the textually apparent legislative objective of its § 1359 exemption, as well as the realities of the market place.

◼ The ultimate purpose of the manufacturer's exemption is to enhance this state's competitive position in inducing industries to locate and expand in Oklahoma. [24] The trend in manufacturing is toward the use of recyclable materials in manufactured goods. [25] The Legislature will not be perceived to have intended the exemption to discriminate against those businesses which produce saleable goods from *recycled* materials by placing them in a less favorable position than those which use *new* materials. In conformity with the Legislature's apparent objective—that of encouraging the development of industry—and in the absence of specific provisions for dealing with the *remanufacturing of used, recyclable goods,* we hold that the § 1352(H) definition of "manufacturing" includes both (a) the production of new and raw material and (b) the "remanufacturing" of used and commercially valueless material by the application of machinery, labor and

---

20. 208 Okl. 138, 253 P.2d 1067, 1069 (1953).

21. Okl.App., 805 P.2d 110, 111–112 (1990).

22. For a discussion of the distinction between a "repairer" and "manufacturer" see *Clawson & Bals, Inc. v. Harrison,* 108 F.2d 991, 994 (7th Cir.1940); *State v. Ill. Cent. Gulf RR.,* 54 Ala. App. 131, 306 So.2d 1, 2, 4 (1975); *Eastern Machinery Co. v. Peck,* 160 Ohio St. 144, 51 O.O. 57, 114 N.E.2d 55, 58–59 (1953).

23. This distinction finds support in the Sales Tax Code's definition of "repairman"—"i.e., any person who performs any repair service upon tangible *personal property of the consumer,* whether ... [he] incorporates tangible personal property belonging to or purchased by the repairman into the ... property being repaired." 68 O.S.Supp. 1989 § 1352(K). The quoted language remains

unchanged by the 1991, 1992 or 1993 amendments.

24. *See Dairy Queen of Oklahoma v. Oklahoma Tax Commission,* 205 Okl. 473, 238 P.2d 800, 802 (1951), where the court notes that the object of the manufacturer's exemption is "to encourage manufacturing industries to locate in the state...." For a similar analysis of the manufacturer's exemption, see *Dept. of Revenue ex rel Luckett v. Allied Drum Service, Inc.,* 561 S.W.2d 323 (Ky.1978); *Perdue Foods, Inc. v. State Department of Assessments and Taxation,* 264 Md. 672, 288 A.2d 170, 173 (1972).

25. *See generally,* J. Thomas Wolfe, *Realistic Recycling,* 37 Fed.B. News & J. 90 (1990).

skill which transforms it into a marketable commodity.

█ The Commission asserts that RDL is not a manufacturer because it repairs not only *used pipe purchased for resale,* but also *used pipe belonging to others.* A business engaged in manufacturing does not lose its tax status as a manufacturer merely because it conducts some nonmanufacturing activities. Under Oklahoma's statutory scheme the test of a manufacturer's tax status is whether, considering the business as a whole, it was *"primarily engaged in manufacturing".*[26] The record reflects that only 10% of RDL's business consists of refurbishing used oilfield pipe of others. RDL has clearly met the law's burden for establishing its status *qua* manufacturer.

Several jurisdictions have dealt with the issue whether under the state taxation regime the term *manufacturing* would include the *remanufacturing* of unusable or recyclable materials for resale.[27] In Pennsylvania the legislature *recently* amended its definition of manufacture to include *"remanufacture"* of certain used products.[28] This change was occasioned by jurisprudence holding remanufacturing of automobile engines not to constitute "manufacture" of a product. That judicial pronouncement made equipment purchased for overhauling or reconditioning of engines subject to use tax. *While neither the text of our tax laws nor prior decisions make the Pennsylvania example persuasive, we nonetheless invite the Legislature to revisit this arena of contention either by further clarifying the meaning, or setting the precise outer limit, of the manufacturer's exemption.*

█ Since it is clear that today's pronouncement settles an issue of *first impression,* we hold that it shall apply *prospectively only* to this case, to cases now pending before judicial or administrative tribunals or in the appellate litigation process, as well as to all controversies over like or identical exempted purchases made[29] *after* our mandate is issued in this cause.[30]

---

**26.** *See* 68 O.S.Supp.1988 § 1359(A), *supra* note 14. *Bert Smith Road Mach. Co. v. Okl. Tax Commission,* Okl., 563 P.2d 641, 643 (1977); *McDonald's Corp. v. Oklahoma Tax Commission,* Okl., 563 P.2d 635, 639 (1977).

**27.** Those cases—which hold that the remanufacturing of discarded, recycled or damaged goods into a marketable article for resale falls within the definition of *manufacturing*—include the following: *Ill. Cent., supra* note 22, 306 So.2d at 4 (rebuilt used railroad box cars); *U.S. v. Armature Exchange,* 116 F.2d 969, 971 (9th Cir.1941) (rebuilt used armatures); *Clawson, supra* note 22 at 994 (reconditioned automobile connecting rods); *County of Chesterfield v. BBC Brown Boveri, Inc.,* 238 Va. 64, 380 S.E.2d 890, 893 (1989) (custom fabrication of replacement copper parts and wiring for electric generators); *Eastern, supra* note 22, 114 N.E.2d at 58 (rebuilt used machine tools); *Luckett, supra* note 24 at 325 (rebuilt used steel drums).
  Among cases reaching the contrary conclusion are two Pennsylvania decisions: *Mack Trucks, Inc. v. Commonwealth of Penn.,* 157 Pa.Cmwlth. 14, 629 A.2d 179, 180 (1993) (production of diesel engines from used engine blocks held nonexempt under the pre–1991 version of the statute); *Beasley Industries, Inc. v. Commonwealth of Penn.,* 116 Pa.Cmwlth. 505, 542 A.2d 210, 212 (1988), *aff'd per curiam,* 521 Pa. 533, 557 A.2d 1062 (1989) (remanufacturing of automobile engines).

**28.** *See Mack Trucks, supra* note 27, 629 A.2d at 180. There the court discusses the amendment of § 201(c) by the Pennsylvania Act of 1991, which specifically included in the definition of *"manufacture"* the *remanufacture* of motor vehicle parts from *used parts* acquired in bulk under certain described circumstances.

**29.** In short, this opinion will *not* govern controversies—*not* now in the litigation pipeline—which involve claimed exemptions on purchases made *before* mandate herein is issued.

**30.** Judicial policy determines whether, and to what extent, a new rule will operate retroactively. *Griggs v. State ex rel. Oklahoma Dept. of Transp.,* Okl., 702 P.2d 1017, 1020 (1985). In *Great Northern Railway v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932), a noncriminal case involving no question of constitutional law, the Court held that a state may choose for itself between the principle of relation back and forward operation of its precedents. For Oklahoma jurisprudence applying a new rule of law to cases in the *pipeline,* see *Amoco Production v. Corp. Com'n of Okl.,* Okl.App., 751 P.2d 203, 208 (1988); *Schepp v. Hess,* Okl., 770 P.2d 34, 39 (1989); *Dow Jones & Co. v. State ex rel. Tax Com'n,* Okl., 787 P.2d 843, 847 (1990). For a discussion of the *pipeline doctrine* see *Strelecki v. Oklahoma Tax Com'n,* Okl., 872 P.2d 910, 915 n. 44 (1994).

## IV

### THE PURCHASE OF DIESEL FUEL FOR RDL'S FORKLIFTS, WHICH ARE USED DURING THE *BATCH–FLOW* MANUFACTURING PROCESS, IS ENTITLED TO A § 1359 SALES TAX EXEMPTION

The Commission asserts that even if RDL is a manufacturer of used oilfield pipe, the fuel purchased from Schulte is still subject to sales tax because its forklifts are *not* used *directly in the manufacturing process.* To qualify for the exemption, the Commission argues, the forklifts, and the fuel that powers them, must have a "manufacturing effect directly touching" [31] the article being produced. According to the Commission, since the forklifts *only move* the pipe around in the yard, they do not have the required impact. RDL argues that, because the fuel is consumed during the batch-flow manufacturing process, it is entitled to a manufacturer's exemption from the motor fuel sales tax. We agree with the latter position.

The remanufacturing process at RDL involves an assortment of procedures which are performed by specialized machines in various work stations located around the pipe-yard. When the pipe arrives at RDL, it is placed by forklifts onto a sorting rack where it is inspected. At that point a determination is made for each piece of pipe with respect to the processing needed to make it meet American Petroleum Institute (API) standards for oilfield use. The pipe is then taken to different work stations for the varied treatments it must undergo in order to make it once again marketable as used pipe. The distance between the work stations varies from 25 feet to 100 feet. The pipe progresses through the remanufacturing process in batches *transported by forklift from one stage of the operation to the next.* This system is known as "batch-flow" manufacturing.

Each work station has a specific purpose. At one station new threads are made for pipes showing thread damage. At another point the pipe is straightened. In one place a "drift" is automatically pushed through the length of the section to check the pipe's diameter. At a different point the pipe is spun on hydraulic rollers while workers clean the threads with high-speed brushes; another brush cleans the outside surface of the pipe. At one stage new couplings are applied over one end of the pipe, while at another station the old couplings are removed from the opposite end (a process known as "reversing the couplings" which results in new threads on each end of the pipe). At another stage the pipe undergoes a high-pressure water test to verify that it has no splits or weak spots and meets API specifications. At yet another station the pipe is electronically inspected with an x-ray machine and at a different place the pipe is beveled. *Heavy* machinery and the application of skill and labor are involved *in every step* of this remanufacturing process.

■ Section 1359 exempts from the sales tax equipment which is "*directly used in*" the manufacturing process as well as property that is "*used or consumed in the process of manufacturing.*" [32] The § 1359 sales tax exemption should receive a practical construction—one that would not allow a manufacturing operation that is in fact but one continuous and integrated production process to be chopped up into distinct and discrete segments. To confine the tax exemption to equipment which *actually* causes some physical change in the manufactured product would impose a restriction not warranted by the language of the statute. We hence hold that within the meaning of § 1359 machinery which is synchronized into the manufacturing operation in a manner that makes it necessary to the production of the finished product is "directly used in" the manufacturing process.

■ The batch-flow manufacturing process utilized by RDL in the transformation of new and used pipe into a marketable product is part of a *single, integrated manufacturing system.* The process begins with the visual inspection of pipe at the sorting rack and ends with the pipe's placement on the stor-

---

**31.** *See* Commission Rule 13.013.23, *supra* note 19.

**32.** For the pertinent provisions of 68 O.S.Supp. 1988 § 1359(A) and (C), see *supra* note 14.

age rack *after* all cleaning and processing has been accomplished. The forklifts used in the operations here in contest, from beginning to end, are an indispensable and integrated part of the production line. The first movement of pipe to a batch station is as essential as the last. Machinery that is so synchronized for the manufacturing operation and so essential to the production of the finished pipe is *used directly in manufacturing* within the meaning of the sales tax exemption. A single integral system may not be broken up into separate component parts for their dichotomous division into those that are used *directly* in production from those that are not. Because forklifts are critical tools in the batch-flow manufacturing system, we hold that the diesel fuel used to power these vehicles is *consumed in the manufacturing process* and hence entitled to a sales tax exemption.

### SUMMARY

Within the meaning of a manufacturer's exemption from both use and sales tax the term "manufacture" encompasses two categories: (a) the processing of *new* or *raw* material as well as the (b) *r*emanufacturing of *unusable* and *damaged* material into a marketable product. RDL's production of new and used oilfield pipe entitles it to a manufacturer status within the meaning of §§ 1352(H) and 1359(A) and (C) and to a MLE certificate.

The batch-flow manufacturing system used here is part of a continuous and integrated production process. The employment of forklifts for transporting new and used pipe within the various stages of this production system is a direct use of equipment in the transformation of the unusable but salvageable oilfield pipe into a usable product. Diesel fuel purchased for the forklifts deployed in this process is hence subject to a sales tax exemption.

Today's pronouncement shall apply *prospectively only* to this case, to cases now pending before judicial or administrative tribunals or in the appellate litigation process, as well as to all controversies over like or

identical exempted purchases made *after* our mandate is issued in this cause.[33]

On certiorari previously granted, the Court of Appeals' opinion is vacated; the Tax Commission's order is reversed and the cause remanded for further proceedings not inconsistent with today's pronouncement.

HODGES, C.J., LAVENDER, V.C.J., and ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

SIMMS, J., concurs in part and dissents in part.

WATT, J., concurs in result.

HARGRAVE, J., dissents.

---

33. For an explanation of this opinion's backward sweep, see *supra* note 29.