2016 OK CIV APP 9

### In the Matter of the AIRCRAFT EXCISE TAX PROTEST OF BMB AIRCRAFT, LLC.

**BMB Aircraft, LLC, Appellant,**

v.

**Oklahoma Tax Commission, Appellee.**

No. 111,080.

Court of Civil Appeals of Oklahoma, Division No. 4.

Feb. 18, 2016.

trate the parties' disputes.

Travis W. Watkins, Jordan F. Wilcox, Joseph A. Goldstein, Law Offices of Travis W. Watkins, P.C., Oklahoma City, Oklahoma, for Appellant.

Douglas B. Allen, General Counsel, Marjorie L. Welch, First Deputy General Counsel, Sean R. McFarland, Assistant General Counsel, Oklahoma Tax Commission, Oklahoma City, Oklahoma, for Appellee.

DEBORAH B. BARNES, Judge.

¶1 This appeal, which has been made a companion appeal to Case No. 112,549, arises from the denial of an exemption from Oklahoma's aircraft excise tax. After purchasing an aircraft, Appellant BMB Aircraft, LLC (BMB) sought an exemption from the excise tax under 68 O.S. 2011 § 6003(5) as an aircraft "purchased or used by commercial airlines[.]" Appellee Oklahoma Tax Commission (OTC) denied BMB's exemption claim, BMB filed a protest, and the case was assigned to an Administrative Law Judge (ALJ). Following the filing by the OTC of a motion for summary disposition under Oklahoma Administrative Code § 710:1–5–38.1, the ALJ filed its "Findings, Conclusions and Recommendations." The ALJ concluded that BMB's protest to the imposition of the aircraft excise tax should be denied and, in an Order filed in August, 2012, the OTC

adopted the ALJ's findings and conclusions. Based on our review, we affirm the determination that the ·exemption does not apply, and we deny BMB's request for a remission of penalties and interest.

## BACKGROUND

¶2 In May, 2010, Robert L. Mills (Bob Mills), acting as the "President/Member"· of BMB, executed a purchase agreement for the purchase of a Cessna Model 560XL aircraft from Cessna Aircraft Company of Wichita, Kansas, for a total purchase price of $10,555,825. The purchase agreement states that the "Scheduled Delivery Month Fly–Away Factory ... Wichita, Kansas, is July 2010." On July 1, 2010, BMB tendered to Cessna, via wire transfer, a sum in excess of $9 million as the balance due upon delivery, and BMB registered the aircraft with the Federal Aviation Administration (FAA).

¶3 Also on July 1, 2010, BMB and Mission Transportation, LLC (Mission) entered into an "Aircraft Lease Agreement." This· agreement· states that ·"Lessee [i.e., Mission] desires to lease from BMB, and BMB desires to lease to [Mission], the Aircraft in accordance with the terms .and conditions contained in this Agreement[.]" The agreement provides, among other things, that the aircraft is leased "on a nonexclusive basis," but also provides that Mission "shall have complete and absolute 'operational control' of the Aircraft and shall maintain 'possession, command and control' of the Aircraft ...· during the Lease Operations."

Tax: $341,250
Interest (through 10/31/10): $12,796.86
Penalty: $34,125
**Total:** $388,171.86

¶6 By letter dated January 11, 2011, BMB protested the assessment of an excise tax, claiming an exemption under 68 O.S. 2011 § 6003(5), i.e., for "[a]ircraft purchased or used by commercial airlines[.]" BMB asserted that, in the lease agreement with Mission, "operational control" of the aircraft was "del-

¶4 In late May or early June, 2010, Mission submitted a pre-application statement of intent to the FAA, the initial step toward receiving a "Part 135 Air Carrier Certificate" from the FAA. This pre-application was rejected; however, in late June or early July., 2010, Mission submitted a second pre-application to the FAA. In a letter. dated July 14, 2010, an employee of the FAA acknowledged receipt of the second pre-application, stating "we are unable to immediately commence processing any new applications for air carrier certification," but further stating .that the application would be placed "on a holding queue" until processing could continue. BMB admits that Mission did not possess a Part 135 Certificate throughout the proceedings below, but was, instead, proceeding through the application process; BMB asserted in the filings below that Mission "fully expects to complete the process , successfully." Indeed, BMB asserted that in .February, 2013, during the pendency of this appeal, Mission was finally awarded a Part 135 Certificate, just a few days after BMB filed its Reply Brief. However, BMB's attempt .to add a copy of the Part 135 Certificate to the appellate record was denied by Order of the Oklahoma Supreme. Court.[1]

¶5 In late July, 2010, BMB registered the aircraft with the OTC. BMB. reported that no aircraft excise tax was due, which triggered an examination by the OTC. On November 17, 2010, the OTC issued a proposed assessment of the aircraft excise tax, and mailed a notice to BMB advising it that an aircraft excise tax was due in the following amounts:

egate[d]" to Mission, an entity which, according to BMB, constituted a commercial airline under· the statute. BMB admitted "that Mission does not currently hold a Part 135 on-demand Air Carrier Certificate from the FAA," but asserted that "upon receipt of Mission's Part 135 Certificate, the Aircraft

---

1. By motion filed in March, 2013, BMB sought to add the alleged Part 135 Certificate to the record on appeal. However, by Order filed in April, 2013, the Oklahoma Supreme Court denied BMB's request on the basis that "appellate review is confined to that record which was made at the [OTC] at the time of its· decision," citing *State v. Torres*, 2004 OK 12, ¶8, 87 P.3d .572, and Rule 1.32 of the Oklahoma Supreme Court Rules.

shall be exempt from Oklahoma Aircraft Excise Tax under" § 6003(5).

¶ 7 BMB also argued, among other things, that it was not the intent of the Legislature in drafting the exemption found in § 6003(5) to place a significant burden on commercial airline startups in Oklahoma—i.e., the burden of having to pay a 3.25% aircraft excise tax on each acquisition—that is not placed on the purchase of aircrafts by established commercial airlines. In other words, entities attempting to become established "commercial airlines" in Oklahoma, and that are going through the process of applying for a Part 135 Certificate—part of which process, BMB asserts, requires that they have an aircraft—would, under the OTC's interpretation of § 6003(5), have to pay an aircraft excise tax simply because they had not fully completed the five-step application process with the FAA. BMB asserted that "[t]o adopt [the OTC's] construction of the exemption . . . would be excessively penal and an impractical application of Oklahoma tax law that would prevent the future development and growth of aircraft charter operators in Oklahoma." BMB asserted the application for a Part 135 Certificate can take "several months, if not up to a year, to process," and the OTC's

> position would require that future aircraft charter operators must wait this entire period, while missing potentially valuable opportunities, before contracting to acquire the use of aircraft for purposes of their charter operations. This cannot be the legislative intent of the exemption, which is intended to defer tax on the transfer of ownership of aircraft in lieu of the sales tax and other taxes generated through each aircraft's numerous flight operations.

¶ 8 In February, 2011, the OTC acknowledged receipt of BMB's protest and initiated its process of review. As stated above, the case was assigned to an ALJ and, following the filing by the OTC of a motion for summary disposition under Oklahoma Administrative Code § 710:1–5–38.1, the ALJ filed its "Findings, Conclusions and Recommendations." The ALJ concluded that BMB's protest to the imposition of the aircraft excise tax should be denied and, in an Order filed in August, 2012, the OTC adopted the ALJ's findings and conclusions. From the OTC's Order, BMB appeals.[2]

## STANDARD OF REVIEW

¶ 9 The following statement made by the Oklahoma Supreme Court in *Neer v. State ex rel. Oklahoma Tax Commission,* 1999 OK 41, 982 P.2d 1071, is applicable to the present case:

> When OTC, an administrative agency, acts in its adjudicative capacity—as it acted here—an order issued by it will be affirmed on appeal if (1) the record contains substantial evidence supporting the facts upon which the order is based and (2) the order is free of legal error. In that the parties stipulated to the basic facts, it is unnecessary to conduct a substantial evidence inquiry. The central question is legal and involves deciding whether OTC . . . properly interpreted and applied relevant statutory law to the stipulated facts.

*Id.* ¶ 3 (citations omitted). In this regard, the Oklahoma Supreme Court has stated that "[s]tatutory interpretation presents a question of law which is subject to our *de novo* review. The OTC's legal rulings are subject to an appellate court's plenary, independent and nondeferential reexamination." *Am. Airlines, Inc. v. State ex rel. Okla. Tax Comm'n,* 2014 OK 95, ¶ 25, 341 P.3d 56 (footnotes omitted).

> Statutory construction presents a question of law. The Commission's legal rulings, like those made by a district court judge, are on review subject to an appellate court's plenary, independent and nondeferential reexamination. We hence review *de novo* the Commission's attribution of meaning to the critical part of the statutory text

*Blitz U.S.A., Inc. v. Okla. Tax Comm'n,* 2003 OK 50, ¶ 6, 75 P.3d 883 (footnotes omitted).[3]

---

2. As indicated above, this appeal and Case No. 112,549 were made companion appeals by Order of the Oklahoma Supreme Court in February, 2014.

3. Although our standard of review is *de novo,* we note that the OTC's construction of the relevant statutory provisions nevertheless has some per-

## ANALYSIS

### I. Commercial Airline Exemption

 ¶ 10 "[T]ax exemptions must be construed sensibly in order to give effect to the governing legislative scheme." *Am. Airlines,* 2014 OK 95, ¶ 31, 341 P.3d 56 (citation omitted).

The cardinal rule of statutory construction is to ascertain and give effect to the legislative intent and purpose as expressed by the statutory language. If the legislative intent cannot be ascertained from the language of a statute, as in the cases of ambiguity, we must apply rules of statutory construction. The test for ambiguity in a statute is whether the statutory language is susceptible to more than one reasonable interpretation. Where a statute is ambiguous or its meaning uncertain it is to be given a reasonable construction, one that will avoid absurd consequences if this can be done without violating legislative intent.... The legislative intent will be ascertained from the whole act in light of its general purpose and objective considering relevant provisions together to give full force and effect to each. Any doubt as to the purpose or intent of a statute may be resolved by resort to other statutes relating to the same subject matter. This Court will not limit consideration to one word or phrase but will consider the various provisions of the relevant legislative scheme to ascertain and give effect to the legislative intent and the public policy underlying the intent.

*Id.* ¶ 33 (citations omitted).

¶ 11 Title 68 O.S. 2011 § 6002 provides, in part, as follows:

Beginning on and after July 1, 1984, there shall be levied an excise tax of three and one-fourth percent (3 1/4%) of the purchase price of each aircraft that is to be registered with the [FAA], upon the transfer of legal ownership of any such aircraft or the use of any such aircraft within this state.

¶ 12 However, 68 O.S. 2011 § 6003 provides that certain aircraft are exempt from the aircraft excise tax. Section 6003 provides, in pertinent part, as follows: "The following aircraft shall be exempt from provisions of Section 6001 et seq. of this title: ...; 5. Aircraft purchased or used by commercial airlines as defined by paragraph 2 of Section 6001 of this title[.]" [4]

¶ 13 Although there is no dispute that the purchaser of the aircraft in this case—BMB—is not a commercial airline, the parties do dispute whether Mission, the lessee of the aircraft, is a commercial airline. Therefore, the particular language under consideration is: "Aircraft ... used by commercial airlines as defined by paragraph 2 of Section 6001 of this title[.]"

¶ 14 The term "commercial airline" is defined in 68 O.S. 2011 § 6001(2) as follows:

"Commercial airline" means an air carrier, foreign air carrier or intrastate air carrier, as defined by Section 40102 of Title 49 of the United States Code, 49 U.S.C., Section 40102, *and* operating pursuant to Part 121 or 129 of Title 14 of the Code of Federal Regulations, 14 CFR, Part 121 or 129, or conducting scheduled or unscheduled services pursuant to Part 135 thereof[.]

(Emphasis added.)

¶ 15 An "air carrier" is defined under 49 U.S.C. § 40102 as follows: " 'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." In addition, in the present case, Mission was applying for a Part 135 Certificate; consequently, only that portion of the Code of Federal Regulations applies directly to this case. It follows that the definition of a "commercial airline," as it applies to the circumstances of this case, can be distilled to the following formulation: one "undertaking by any means, directly or indirectly, to provide air transportation," *and* "conducting scheduled or unscheduled services pursuant to Part 135" of Title 14 of the Code of Federal Regulations. Placing that definition together with the other applicable

---

suasive value, as stated in more detail in the Analysis section of this Opinion.

**4.** Section 6003 was amended by laws effective November 1, 2013. However, the pertinent language was not changed.

statutory provisions, the exemption at issue applies to "[a]ircraft ... used by" one "undertaking by any means, directly or indirectly, to provide air transportation," *and* "conducting scheduled or unscheduled services pursuant to Part 135" of Title 14 of the Code of Federal Regulations.

¶16 The OTC asserts that the aircraft in this case does not qualify for the exemption because, in effect, Mission was not "conducting scheduled or unscheduled services pursuant to Part 135" at the time of the purchase or registration of the aircraft. Indeed, Mission was, at best, merely in the midst of the application process for the Part 135 Certificate at the time of the purchase and registration—Mission clearly had not yet completed the application process at that time and, indeed, according to BMB's own assertions, it did not complete the application process until over two-and-a-half years later, in February, 2013. The OTC asserts that only aircraft used by air carriers that have completed the Part 135 application process at the time of transfer of ownership can qualify for the excise tax.

¶17 The OTC's interpretation of the statute is a reasonable one. The excise tax is to be "levied ... upon the transfer of legal ownership of any such aircraft or the use of any such aircraft within this state." 68 O.S. 2011 § 6002. Although an "air carrier" is defined as one "*undertaking* by any means, directly or indirectly, *to provide air transportation*"—a definition that Mission appears to satisfy, at least when viewing the facts in a light most favorable to BMB—the *complete definition* of a "commercial airline" requires that one (1) meet that definition (i.e., pertinent to this case, the definition of an "air carrier"), *and* (2) be either "*operating* pursuant to Part 121 or 129 of Title 14 of the Code of Federal Regulations," or "*conducting* scheduled or unscheduled services pursuant to Part 135 thereof[.]" (Emphasis added.) Pertinent to this case, 14 C.F.R. § 119.33 provides that "[a] person other than a direct air carrier may *not conduct* any commercial passenger or cargo aircraft oper-

ation for compensation or hire under part 121 *or part 135* of this chapter unless that person," among other things, "(2) Obtains an Operating Certificate[.]" (Emphasis added.) Because it is undisputed that Mission never obtained a certificate, at least not until February, 2013, there exists, at the very least, substantial doubt regarding whether Mission—an entity that was just commencing the application process for a Part 135 Certificate at the time of the purchase and use of the aircraft in this state, *and was not conducting services pursuant to Part 135*—constituted a "commercial airline" for purposes of the exemption.

¶18 Importantly, "[s]tatutes exempting property from taxation are to be strictly construed against the claimant." *Am. Airlines*, 2014 OK 95, ¶30, 341 P.3d 56 (citing *Blitz U.S.A.*, 2003 OK 50, ¶14, 75 P.3d 883). "Claims of exemption must be by express grant. An exemption cannot exist by implication *and a doubt is fatal to the claim of exemption.*" *Am. Airlines*, ¶30 (emphasis added) (citations omitted). The rule of strict construction "does not mean that words shall be so restricted as not to have their full meaning, but merely means that *everything shall be excluded* from the operation of the statutes so construed *which does not clearly come within the meaning of the language used.*" *Id.* ¶31 (quoting *Colcord v. Granzow*, 1928 OK 211, ¶18, 137 Okla. 194, 278 P. 654) (emphasis added).

¶19 BMB purchased the aircraft in question in the summer of 2010 and immediately began using the aircraft for purposes unrelated to "conducting ... services pursuant to Part 135" of Title 14 of the Code of Federal Regulations.[5] BMB did enter into an aircraft lease agreement around this time with Mission, but it is undisputed that Mission was not conducting services pursuant to Part 135 because Mission had only just submitted a pre-application with the FAA. Even viewing the facts in a light most favorable to BMB, Mission could not begin conducting such services until more than two-and-a-half years later.

---

5. For example, BMB does not dispute that "the subject aircraft has been used by Bob Mills Furniture Co., L.L.C. ... since the aircraft was regis- tered in Oklahoma." R. at 372. As stated above, Bob Mills is the president of BMB.

¶ 20 As concluded above, the OTC's interpretation of the statutory provisions, and its conclusion that the exemption does not apply in this case, are reasonable.

> Great weight is to be accorded the expertise of an administrative agency, and a presumption of validity attaches to the exercise of expertise when the administrative agency is reviewed by a court. A court should not substitute its own judgment for that of an agency, particularly in the area of expertise which the agency supervises.

*Toxic Waste Impact Grp., Inc. v. Leavitt,* 1988 OK 20, ¶ 12, 755 P.2d 626 (footnote omitted). To have at least some "persuasive value," the administrative construction must have been reasonable and not clearly wrong. Also, where neither ambiguity nor doubt exists, administrative construction of a statute will not override the plain statutory language." *Keating v. Edmondson,* 2001 OK 110, ¶ 15, 37 P.3d 882 (footnotes omitted). Moreover, an agency's construction of a statute is accorded "great weight" by courts

> when (1) the administrative interpretation was made contemporaneously with the enactment of the statute, (2) a longstanding construction has been placed on the statute by an agency charged with its execution[,] or (3) a word-for-word reenactment of statutory text previously burdened with time-honored agency gloss may be regarded as the Legislature's act of acquiescence in the pre-reenactment administrative construction.

*Schulte Oil Co., Inc. v. Okla. Tax Comm'n,* 1994 OK 103, ¶ 4, 882 P.2d 65 (footnotes omitted). Although none of these three scenarios appears to exist in the present case, and we, therefore, cannot afford "great weight" to the OTC's construction, the OTC's interpretation is reasonable and not clearly wrong. Consequently, it has some secondary, but not insignificant, "persuasive value." *See also Davis v. GHS Health Maint. Org., Inc.,* 2001 OK 3, ¶ 13, 22 P.3d 1204 ("Administrative construction of a statute by an agency charged with its implementation and enforcement is given persuasive effect.") (citing *Schulte Oil,* ¶ 4).

¶ 21 The persuasive effect of the OTC's construction, in combination with our duty to strictly construe against the claimant statutes exempting property from taxation, necessitate our conclusion that the exemption does not apply. Even viewing the facts in a light most favorable to BMB, the aircraft in question "does not clearly come within the meaning of the language used," *Am. Airlines, Inc.,* ¶ 31 (citation omitted), and substantial doubt exists regarding the applicability of the exemption. As quoted above, "a doubt is fatal to the claim of exemption." *Id.,* ¶ 30 (citations omitted). Therefore, we affirm the determination of the OTC that the exemption does not apply.

## II. Assessment of Penalty and Interest

¶ 22 BMB requests, in the alternative, that this Court waive all penalties and interest assessed against it by the OTC. BMB makes this request for the first time on appeal.[6] BMB asserts that 68 O.S. 2011 § 220 "allows for such a waiver or remission of penalty and/or interest for a taxpayer's failure to pay a state tax resulting from a taxpayer's mistake of law and/or facts subjecting it to such tax."[7] Section 220(A) provides:

> The interest or penalty or any portion thereof ordinarily accruing by reason of a taxpayer's failure to file a report or return or failure to file a report or return in the correct form as required by any state tax law or by this Code or to pay a state tax within the statutory period allowed for its payment may be waived or remitted by the [OTC] or its designee provided the taxpayer's failure to file a report or return or to pay the tax is satisfactorily explained to the [OTC] or such designee, or provided such failure has resulted from a mistake by the taxpayer of either the law or the facts subjecting him to such tax, or inability to

---

**6.** BMB directs us to no record, and we find no record, that it requested any waiver from the OTC in the proceedings below, or that a waiver was denied following such a request. Moreover, BMB makes no assertion that it made such a request below, but rather states in its appellate brief that it "hereby argues and requests that the penalties and interest be waived." Br.-in-chief at 21.

**7.** Br.-in-chief at 21–22.

pay such interest or penalty resulting from insolvency.

¶ 23 In *In re Woods Corp.*, 1975 OK 19, 531 P.2d 1381, the Oklahoma Supreme Court reversed the OTC's assessment of penalty and interest, but only after first verifying that the petitioner "requested a remission of penalty and interest pursuant to [§ 220]" in the proceedings before the OTC. *Woods*, ¶ 50.[8] As explained by a separate division of this Court, "Section 220 makes waiver of interest and penalty discretionary with [the OTC]. Although this Court certainly has the power to order a remittitur of the interest and penalty, *we will not do so unless Appellants show us [the OTC] abused its discretion.*" *Exxon Corp. v. Okla. Tax Comm'n*, 1993 OK CIV APP 178, ¶ 18, 873 P.2d 306 (emphasis added) (footnote omitted).

¶ 24 BMB has failed to demonstrate that the OTC has abused its discretion. This Court cannot find an agency has abused its discretion when that agency has, pursuant to the record presented, not yet exercised any discretion or made an appealable decision. This Court will not order such a remission in the first instance on appeal, and, consequently, we deny BMB's request.[9]

## CONCLUSION

¶ 25 Based on our review, we affirm the determination of the OTC that the exemption for aircraft "purchased or used by commercial airlines" does not apply to the circumstances presented. Furthermore, we deny BMB's request for a remission of penalties and interest.

¶ 26 **AFFIRMED.**

RAPP, P.J., and THORNBRUGH, J., concur.

---

8. Moreover, the OTC admitted in *Woods* that the petitioner timely requested such a waiver in the proceedings before the OTC. *Id.* ¶ 51.

9. This conclusion is consistent with the reasoning set forth in *Woods* and *Exxon*, discussed above, but it is also consistent with the fact that "it is not the duty of the appellate court on review to make first-instance determinations of disputed law or fact issues. An appellate court cannot craft an initial decision upon an untried question and then direct that it be followed on remand." *Evers v. FSF Overlake Assocs.*, 2003 OK 53, ¶ 18, 77 P.3d 581 (emphasis omitted) (internal quotation marks omitted) (citations omitted).